**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

COINBASE FINANCIAL MARKETS, INC.,

       Plaintiff,

v.

KWAME RAOUL, in his official capacity as Attorney General of Illinois, et al.,

       Defendants.

No. 25 C 15406

Honorable Martha M. Pacold

**DEFENDANTS' RESPONSE IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

KWAME RAOUL
Illinois Attorney General

R. Douglas Rees
Darren Kinkead
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

LEGAL STANDARD ............................................................................................... 6

ARGUMENT ............................................................................................................. 7

I.      Coinbase is unlikely to succeed on the merits of its preemption claims. ........................... 7

      A.      Coinbase's contracts are not "swaps" under the Commodity Exchange Act.......... 8

            1.      Coinbase's contracts do not depend on the occurrence of an "event." ........................................................................................... 10

            2.      Coinbase's contracts are not "associated with" an economic consequence. ................................................................................ 14

      B.      Congress did not intend to displace the states' gambling laws when it gave the CFTC "exclusive jurisdiction" over swaps..................................... 18

            1.      Section 2(a)(1)(A) of the Commodity Exchange Act only preempts state laws that directly affect trading on a regulated market. ................... 19

            2.      Illinois law does not directly affect trading on a regulated market.......... 23

            3.      Congress did not preempt all state laws affecting regulated markets.......................................................................................... 26

      C.      Congress does not "hide elephants in mouseholes.".............................................. 27

II.     Coinbase has not shown the sort of harm necessary for a preliminary injunction. .......... 29

III.    The public interest and balance of equities do not support preliminary relief................. 30

CONCLUSION............................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*Ah Sin v. Wittman*,
  198 U.S. 500 (1905)................................................................... 26

*Alabama Association of Realtors v. Department of Health & Human Services*,
  594 U.S. 758 (2021)................................................................... 28

*Altria Group, Inc. v. Good*,
  555 U.S. 70 (2008)....................................................................... 7

*American Agriculture Movement, Inc. v. The Board of Trade of the City of Chicago*,
  977 F.2d 1147 (7th Cir. 1992) ............................ 19, 20, 22, 24, 26

*Armstrong v. Exceptional Child Center, Inc.*,
  575 U.S. 320 (2015)..................................................................... 7

*Beecham v. United States*,
  511 U.S. 368 (1994)................................................................... 17

*Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Insurance Co.*,
  671 F.3d 635 (7th Cir. 2011) ..................................................... 1

*Bond v. United States*,
  572 U.S. 844 (2014)....................................................... 15, 27, 28

*Bostock v. Clayton County*,
  590 U.S. 644 (2020)................................................................... 10

*California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*,
  519 U.S. 316 (1997)................................................................... 16

*Cipollone v. Liggett Group, Inc.*,
  505 U.S. 504 (1992)................................................................... 21

*Commonwealth v. KalshiEX LLC*,
  No. 2584CV02525 (Mass. Super. Ct. Jan. 20, 2026)...................... 24

*Crusius v. Illinois Gaming Board*,
  837 N.E.2d 88, 216 Ill. 2d 315 (2005) ....................................... 3

*CSX Transportation, Inc. v. Easterwood*,
  507 U.S. 658 (1993)..................................................................... 7

*Delaware State Sportsmen's Association, Inc. v. Delaware Department of Safety & Homeland Security*, 108 F.4th 194 (3d Cir. 2024) .................................................................................. 29

*Delligatti v. United States*,
604 U.S. 423 (2025) .................................................................................. 9, 15

*Digital Realty Trust, Inc. v. Somers*,
583 U.S. 149 (2018) .................................................................................. 4, 18

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) .................................................................................. 29

*Edwards v. Aguillard*,
482 U.S. 578 (1987) .................................................................................. 17

*Effex Capital, LLC v. National Futures Association*,
933 F.3d 882 (7th Cir. 2019) .................................................................................. 19, 24, 26, 28

*English v. General Electric Co.*,
496 U.S. 72 (1990) .................................................................................. 25

*Epic Systems Corp. v. Lewis*,
584 U.S. 497 (2018) .................................................................................. 2

*Ex parte Young*,
209 U.S. 123 (1908) .................................................................................. 8

*Fischer v. United States*,
603 U.S. 480 (2024) .................................................................................. 22

*Florida Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963) .................................................................................. 26

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) .................................................................................. 22

*Greater New Orleans Broadcasting Association, Inc. v. United States*,
527 U.S. 173 (1999) .................................................................................. 15

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .................................................................................. 21

*Hawthorne Kennel Club v. Swanson*,
171 N.E. 140, 339 Ill. 220 (1930) .................................................................................. 3

iv

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ........................................................................................ 20

*Hoosier Energy Rural Electric Cooperative, Inc. v. John Hancock Life Insurance Co.*,
    582 F.3d 721 (7th Cir. 2009) ...................................................................... 18

*Investment Company Institute v. CFTC*,
    720 F.3d 370 (D.C. Cir. 2013) ...................................................................... 9

*Investment Company Institute v. CFTC*,
    891 F. Supp. 2d 162 (D.D.C. 2012) ........................................................... 15

*Iris Amusement Corporation v. Kelly*,
    8 N.E.2d 648, 366 Ill. 256 (1937) ................................................................ 3

*KalshiEX LLC v. Flaherty*,
    No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) ........................ 19

*KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW,
    2025 WL 3286282 (D. Nev. Nov. 24, 2025) ........................................... 12, 14, 16, 17, 18

*KalshiEX LLC v. Martin*,
    793 F. Supp. 3d 667 (D. Md. 2025) ..................................................... 21, 24, 28

*Kansas v. Garcia*,
    589 U.S. 191 (2020) ...................................................................................... 26

*Kerr v. First Commodity Corp. of Boston*,
    735 F.2d 281 (8th Cir. 1984) ...................................................................... 20

*King v. Burwell*,
    576 U.S. 473 (2015) ...................................................................................... 28

*Kurns v. Railroad Friction Products Corp.*,
    565 U.S. 625 (2012) ...................................................................................... 22

*Mallett v. Butcher*,
    41 Ill. 382 (1866) ..................................................................................... 1, 3

*Maracich v. Spears*,
    570 U.S. 48 (2013) ........................................................................................ 15

*Maryland v. King*,
    567 U.S. 1301 (2012) .................................................................................... 30

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ............................................................................................. 4

*Midwest Electronics Gaming, LLC v. Illinois Gaming Board*,
    --- N.E.3d ----, 2025 IL App (1st) 241076 ...................................................... 30

*Minocqua Brewing Company LLC v. Hess*,
    160 F.4th 849 (7th Cir. 2025) .......................................................................... 7

*MITE Corp. v. Dixon*,
    633 F.2d 486 (7th Cir. 1980) .......................................................................... 25

*Morgan v. White*,
    964 F.3d 649 (7th Cir. 2020) .......................................................................... 29

*Moskal v. United States*,
    498 U.S. 103 (1990) ......................................................................................... 11

*Murphy v. NCAA*,
    584 U.S. 453 (2018) ................................................................. 2, 3, 10, 17, 30

*Murphy v. Smith*,
    583 U.S. 220 (2018) ......................................................................................... 20

*National Association of Manufacturers v. Department of Defense*,
    583 U.S. 109 (2018) ......................................................................................... 13

*Nelson v. Great Lakes Educational Loan Services, Inc.*,
    928 F.3d 639 (7th Cir. 2019) .......................................................................... 26

*New York State Department of Social Services v. Dublino*,
    413 U.S. 405 (1973) ......................................................................................... 27

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................................... 30

*North American Derivatives Exchange, Inc. v. Nevada*, No. 2:25-cv-00978-APG-BNW,
    2025 WL 2916151 (D. Nev. Oct. 14, 2025) ........................................10, 11, 12, 28, 30

*O Centro Espírita Beneficente União do Vegetal v. Ashcroft*,
    389 F.3d 973 (10th Cir. 2004) ........................................................................ 29

*Patriotic Veterans, Inc. v. Indiana*,
    736 F.3d 1041 (7th Cir. 2013) ........................................................................ 21

*Protect Our Parks, Inc. v. Buttigieg,*
   39 F.4th 389 (7th Cir. 2022) ........................................................ 7

*Pulsifer v. United States,*
   601 U.S. 124 (2024) .................................................................... 20

*R.J. Hereley & Son Co. v. Stotler & Co.,*
   466 F. Supp. 345 (N.D. Ill. 1979) ............................................... 21

*Reiser v. Residential Funding Corp.,*
   380 F.3d 1027 (7th Cir. 2004) ..................................................... 19

*Rice v. Santa Fe Elevator Corp.,*
   331 U.S. 218 (1947) ...................................................................... 7

*Robinhood Derivatives, LLC v. Dreitzer,*
   No. 2:25-cv-01541-APG-DJA, 2025 WL 3283308 (D. Nev. Nov. 25, 2025) ................. 29

*Rosemont v. Jaffe,*
   482 F.3d 926 (7th Cir. 2007) ....................................................... 28

*Schreiber v. Burlington Northern, Inc.,*
   472 U.S. 1 (1985) ........................................................................ 12

*Second City Music, Inc. v. Chicago,*
   333 F.3d 846 (7th Cir. 2003) ....................................................... 29

*Slaney v. The International Amateur Athletic Federation,*
   244 F.3d 580 (7th Cir. 2001) ....................................................... 21

*South Branch LLC v. Commonwealth Edison Co.,*
   46 F.4th 646 (7th Cir. 2022) ....................................................... 27

*Starbucks Corp. v. McKinney,*
   602 U.S. 339 (2024) ...................................................................... 6

*Stenberg v. Carhart,*
   530 U.S. 914 (2000) ...................................................................... 9

*Sturgeon v. Frost,*
   587 U.S. 28 (2019) ...................................................................... 23

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ...................................................................... 8

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
    566 U.S. 560 (2012) ............................................................................... 11

*Thrifty Oil Co. v. Bank of America National Trust & Saving Association*,
    322 F.3d 1039 (9th Cir. 2003) ............................................................... 9

*Transcontinental Gas Pipe Line Co., LLC v. Pennsylvania Environmental Hearing Board*,
    108 F.4th 144 (3d Cir. 2024) ................................................................. 21

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ............................................................................... 29

*Turek v. General Mills, Inc.*,
    662 F.3d 423 (7th Cir. 2011) ................................................................. 21

*United States v. Illinois*,
    795 F. Supp. 3d 1057 (N.D. Ill. 2025) ................................................. 7

*United States v. King*,
    834 F.2d 109 (6th Cir. 1987) ............................................................ 1, 28

*United States v. Lopez*,
    514 U.S. 549 (1995) ............................................................................... 14

*United States v. Phillips*,
    155 F.4th 102 (2d Cir. 2025) ..................................................... 8, 15, 17

*United States v. Smith*,
    997 F.3d 215 (5th Cir. 2021) ................................................................. 11

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014) ............................................................................... 12

*Virginia Uranium, Inc. v. Warren*,
    587 U.S. 761 (2019) ............................................................................... 22

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................................................... 28

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ............................................................................... 27

*WV Association of Club Owners & Fraternal Services, Inc. v. Musgrave*,
    553 F.3d 292 (4th Cir. 2009) ............................................................ 2, 26

*Zyla Life Sciences, L.L.C. v. Wells Pharma of Houston, L.L.C.*,
    134 F.4th 326 (5th Cir. 2025) ........................................................................... 25

**Constitutional Provisions**

U.S. const. art. VI, cl. 2 .................................................................................... 7

**Statutes**

7 U.S.C. § 1a ............................................................ 4, 10, 12, 13, 14, 15, 17

7 U.S.C. § 2 ............................................................................................ 4, 8, 19

7 U.S.C. § 7a-2 ...................................................................................... 5, 23, 26

7 U.S.C. § 7b-3 .................................................................................................. 4

7 U.S.C. § 16 .......................................................................................... 20, 21

15 U.S.C. § 3001 ............................................................................................... 2

18 U.S.C. § 1084 ............................................................................................. 23

20 ILCS 1605 .................................................................................................... 3

230 ILCS 10/5 .................................................................................................. 3

230 ILCS 45/art. 25 ......................................................................................... 3

230 ILCS 45/25-10 .......................................................................................... 8

230 ILCS 45/25-20 ..................................................................................... 3, 24

230 ILCS 45/25-25 ..................................................................................... 3, 25

230 ILCS 45/25-45 ..................................................................................... 3, 30

230 ILCS 45/25-100 ...................................................................................... 30

720 ILCS 5/28-1 ............................................................................................... 3

**Regulations**

17 C.F.R. § 38.151 .......................................................................................... 25

17 C.F.R. § 40.11 ............................................................................................ 23

**Other Authorities**

156 Cong. Rec. (daily ed. July 15, 2010) ................................................................. 23, 24

Appellee's Brief, *KalshiEX LLC v. CFTC*,
  No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) ........................................... 24

Associated, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ....................................... 14

CFTC Letter No. 25-36 .................................................................................. 6

Event Contracts, 89 Fed. Reg. 48,968 (June 10, 2024) ................................................. 4

Illinois Gaming Board, Annual Report (2024) ......................................................... 28

Multi-State Internet Gaming Agreement ............................................................... 25

Public Law 111-203, § 721 ............................................................................. 17

Scalia & Garner, Reading Law (2012) ................................................................. 15

Senate Report 111-176 ................................................................................. 18

**INTRODUCTION**

Let's say you're feeling pretty good about the Seattle Seahawks' chances of winning the Super Bowl next month. So confident, in fact, that you're willing to put some money on the line. Plaintiff Coinbase Financial Markets, Inc. is happy to help. It has partnered with KalshiEX LLC to sell Illinois consumers "event contracts" that ask just that: "Will the Seahawks win the Super Bowl?" If you buy the "yes" position, which is currently available for 40 cents per contract, you'll earn a dollar if Sam Darnold hoists the Lombardi Trophy on February 8.[1]

Coinbase contends its Super Bowl contract is a financial instrument known as a "swap" that is subject to exclusive federal regulation—rather than a sports wager that is subject to state regulation. But in the law, as in life, labels must yield to realities. "Abraham Lincoln once was asked how many legs a donkey has if you call its tail a leg. His answer was four: calling a tail a leg does not make it one." *Blue Cross Blue Shield of Massachusetts, Inc. v. BCS Insurance Co.*, 671 F.3d 635, 637 (7th Cir. 2011). Calling a sports wager a swap does not make it one either.

The Land of Lincoln has regulated all forms of gambling since the man himself made this state his home. But much has changed in the 150 years since the Illinois Supreme Court described a state law voiding "all contracts having their origin in gaming" as a tool "designed to strike at the root of a vice, the indulgence of which more effectually demoralizes its victims than any other which can be named." *Mallett v. Butcher*, 41 Ill. 382, 383-84 (1866). Today, for example, sports wagering is legal (and carefully regulated) in Illinois: a reflection not only of shifting tides in the state's approach to gambling but also of historical competence in our federal system. Since the founding, "the regulation of gambling has been largely left to the state legislatures." *United States v. King*, 834 F.2d 109, 111 (6th Cir. 1987).

---

[1] The Court can find all Kalshi's sports contracts and current prices at kalshi.com/sports/all-sports.

Coinbase could lawfully accept Super Bowl bets in this state if it would simply obtain a license from the Illinois Gaming Board and submit to regulation under Illinois law. It insists it doesn't have to because, it says, Congress quietly stripped the states of this longstanding authority some fifteen years ago in its comprehensive response to the 2008 financial crisis. No one *really* believes that this was Congress's intent. The question, rather, is whether Congress's seemingly capacious language nevertheless compels the Court to vastly expand the federal government's authority at the expense of the states' traditional powers to regulate gambling.

Of course it doesn't. A "statute's meaning does not always 'turn solely' on the broadest imaginable 'definitions of its component words.'" *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 523 (2018). Coinbase's approach relies on a cynical abuse of textualism that the Supreme Court has repeatedly rejected. Instead, the best source for determining Congress's intent is the ordinary public meaning of the statutory language. Applying this rule, along with other interpretive tools, reveals that Congress's definition of "swap" does not include sports wagering and, in any event, that Congress did not intend to preempt state gambling laws when it subjected swaps to federal regulation. Coinbase's motion for a preliminary injunction should therefore be denied.

## BACKGROUND

**State law.** "[R]egulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme." *WV Association of Club Owners & Fraternal Services, Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009). Unsurprisingly, in view of this traditional understanding, there has been "a coherent federal policy" to "respect the policy choices of the people of each State on the controversial issue of gambling." *Murphy v. NCAA*, 584 U.S. 453, 484 (2018); *see, e.g.*, 15 U.S.C. § 3001(a) ("States should have the primary responsibility for determining what forms of gambling may legally take place within their borders.").

Illinois has long exercised its sovereign authority to regulate gambling in the state. In the nineteenth century, the legislature declared void all contracts relating to gambling; the Illinois Supreme Court, in applying this statute, observed that "[a]ll our legislation has been with an earnest desire to put a stop to the vice" of gambling because it "so changes the nature of the infatuated, that they no longer feel the common instincts of humanity, but become brutalized." *Mallett*, 41 Ill. at 383-84. These views are also reflected in the Illinois constitution of 1870, which withdrew from the legislature any "'power to authorize lotteries or gift enterprises.'" *Iris Amusement Corporation v. Kelly*, 8 N.E.2d 648, 650, 366 Ill. 256, 261 (1937).

But the state's approach to gambling has changed over time. In 1927, the legislature permitted wagering on horse races. *Hawthorne Kennel Club v. Swanson*, 171 N.E. 140, 142, 339 Ill. 220, 223 (1930). A state lottery followed in 1974. *See* 20 ILCS 1605. And riverboat gambling was authorized in 1990 in the hopes of "assisting economic development, promoting tourism, and generating revenue for education." *Crusius v. Illinois Gaming Board*, 837 N.E.2d 88, 90-91, 95, 216 Ill. 2d 315, 318-19, 327 (2005). Even so, gambling generally remains unlawful unless it is specifically authorized by Illinois law. *E.g.*, 720 ILCS 5/28-1(a)(2) & (b)(15).

The state's most recent expansion of gambling occurred in 2019 when the legislature authorized wagering on sporting events and athletes' performances. 230 ILCS 45/art. 25. This followed on the heels of the Supreme Court's decision that Congress had exceeded its authority when it tried to bar states from doing just that. *Murphy*, 584 U.S. at 486. A person who wishes to accept sports wagers must be licensed by the Illinois Gaming Board, 230 ILCS 45/25-20(a), and submit to regulation under Illinois law, *id.* 25-25(a). The board, in turn, is tasked with "preserv[ing] the integrity and security of sports wagering" and "promot[ing] and maintain[ing] a competitive sports wagering market." *Id.* 25-45(d); *see* 230 ILCS 10/5(b)(3).

3

**Federal law.** For more than a hundred years, Congress has regulated trading in agricultural products and other commodities. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360-67 (1982). Its initial concern was futures contracts: agreements to trade an asset at a specific price on a future date. *Id.* at 357-60. "[R]ecogniz[ing] the potential hazards as well as the benefits of futures trading," Congress enacted the law that today is known as the Commodity Exchange Act and is "aptly characterized as 'a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'" *Id.* at 355-56, 360. Congress subsequently created the Commodity Futures Trading Commission ("CFTC") and gave it "exclusive jurisdiction" over futures traded on regulated markets. *Id.* at 366-67, 386. The CFTC "is not a gaming regulator" and does not have the "specialized experience appropriate to oversee" gambling. Event Contracts, 89 Fed. Reg. 48,968, 48,982-83 (June 10, 2024).

Congress amended the Commodity Exchange Act again "in the wake of the 2008 financial crisis" as part of its efforts "to 'promote the financial stability of the United States by improving accountability and transparency in the financial system.'" *Digital Realty Trust, Inc. v. Somers*, 583 U.S. 149, 155 (2018). As relevant here, Congress added to the CFTC's "exclusive jurisdiction" certain "transactions involving swaps" that are "traded or executed on a contract market designated pursuant to" the statute. 7 U.S.C. § 2(a)(1)(A). At the same time, Congress defined a "swap" to include "any agreement, contract, or transaction" that, among other things, "provides for any purchase, sale, payment, or delivery" that "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).

A contract market must be "designated" by the CFTC if it wishes to offer swaps or futures for public trading. 7 U.S.C. §§ 2(e), 7b-3(a)(1). Once designated, however, a market may

list new contracts on its exchange without first obtaining the CFTC's approval; it simply needs to provide the commission "a written certification that the new contract" complies with the Commodity Exchange Act. *Id.* § 7a-2(c)(1). A "[s]pecial rule" applies to the CFTC's "review and approval of event contracts": the commission "may determine" that certain contracts "based upon [an] occurrence, extent of an occurrence, or contingency" are "contrary to the public interest" and thus prohibited because they "involve" "gaming" or "activity that is unlawful under any Federal or State law." *Id.* § 7a-2(c)(5)(C)(i)(I) & (V). A contract that the CFTC determines is "contrary to the public interest" may not be listed for trading. *Id.* § 7a-2(c)(5)(C)(ii).

**This litigation.** Kalshi is a CFTC-designated contract market (also referred to as an exchange). ECF 27 at 214.[2] In January 2025, it began to list for trading a contract it called the "'Will <team> win <title>?' Contract." ECF 27-1 at 244. Kalshi explained that "<team> refers to an entity participating in a sport," while "<title> refers to a given sports title, and will include a specified year and/or other distinguishing information, e.g., 'The 2025 National Football League Super Bowl.'" *Id.* at 249. Kalshi self-certified to the CFTC that these contracts satisfy the requirements of the Commodity Exchange Act. *Id.* at 243-52.

In April 2025, the Illinois Gaming Board informed Kalshi that offering these contracts in this state constituted "unlicensed sports wagering in violation of the Illinois Sports Wagering Act, 230 ILCS 45, and Illinois Criminal Code, 720 ILCS 5/28-1(a)." ECF 27-2 at 254. Later that month, the board raised to the CFTC its "significant concerns with the introduction and proliferation of so-called 'sports event contracts.'" ECF 27-5 at 260-61. The board noted the "extensive investigations" that Illinois regulators conduct "to ensure that an applicant meets rigorous integrity and suitability requirements before receiving a sports wagering license," along

---

[2] Page numbers refer to the "PageID" printed by CM/ECF on the top right side of each page.

with the "strict compliance protocols" and other "standards" and "safeguards" governing

licensees and the board's work with sports leagues and law enforcement "to prevent and address

any integrity and safety concerns involving sport competition and betting activity." *Id.* at 260.

"None of these gaming integrity and safety standards or patron protections exist in the sports

event predictions market." *Id.* at 261. The CFTC advised in September 2025 that it was "aware"

of Kalshi's offerings but had not "been requested to take or taken any official action to approve

the listing for trading of sports-related event contracts." CFTC Letter No. 25-36 at 1, 2 n.4.[3]

      Coinbase is a CFTC-registered futures commission merchant: an entity that acts as an

intermediary between exchanges like Kalshi and retail customers who want to trade futures or

swaps. ECF 27 at 214. In December 2025, after "months of careful planning" behind the scenes,

Coinbase publicly "announced that it would begin offering its customers the ability to trade"

Kalshi's sports contracts "in early 2026." *Id.* at 213-14. The next day, Coinbase filed this lawsuit

contending that the Commodity Exchange Act preempts the state laws that forbids it to accept

sports wagers without first obtaining a license from the Illinois Gaming Board and otherwise

complying with state gambling regulations. ECF 1 at 25-35, ¶¶ 64-84. And a few days later,

Coinbase moved for a preliminary injunction. ECF 27. Kalshi and Coinbase are raising similar

challenges to other states' laws across the country. *E.g.*, *KalshiEX LLC v. Martin*, No. 25-1892

(4th Cir.) (Maryland); *KalshiEX LLC v. Hendrick*, No. 25-7516 (9th Cir.) (Nevada); *KalshiEX*

*LLC v. Flaherty*, No. 25-1922 (3d Cir.) (New Jersey).

## LEGAL STANDARD

      "A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded

as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). "A plaintiff seeking a

---

[3] Available at https://www.cftc.gov/csl/25-36/download.

preliminary injunction must establish a likelihood of success on the merits, a likelihood of suffering irreparable harm in the absence of preliminary relief, that the balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest." *Minocqua Brewing Company LLC v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025). "[A] 'strong' showing of likelihood of success" is required. *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 (7th Cir. 2022).

## ARGUMENT

Coinbase cannot satisfy any of the elements necessary for a preliminary injunction.

## I.   Coinbase is unlikely to succeed on the merits of its preemption claims.

The supremacy clause of the United States constitution "creates a rule of decision: Courts 'shall' regard the 'Constitution,' and all laws 'made in Pursuance thereof,' as 'the supreme Law of the Land.' They must not give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015) (quoting U.S. const. art. VI, cl. 2). A state law that conflicts with a federal law is said to be preempted.

There are two categories of preemption: express and implied. *United States v. Illinois*, 795 F. Supp. 3d 1057, 1063 (N.D. Ill. 2025). And there are two subcategories of implied preemption: field and conflict. *Id.* at 1068-69. Coinbase relies on all three of these theories, each of which ultimately turns on congressional intent. *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008). Courts confronted with an argument that Congress has preempted state law focus on the plain language of the federal statute and apply the usual interpretive tools to determine Congress's meaning. *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). But there is a thumb on the scale: courts must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

Unfortunately for Coinbase, the text and structure of the Commodity Exchange Act refute its preemption arguments at every turn. A contract that pays out when a team wins the Super Bowl is not a swap for two independent reasons: it depends on the *outcome* of an event rather than the *occurrence* of an event and, regardless, is not associated with an *inherently* economic consequence. This shortcoming alone is fatal to all Coinbase's theories. But even if a Super Bowl bet was a swap, Coinbase still cannot prevail. It relies on statutory language that gives the CFTC "exclusive jurisdiction" over certain swap transactions. This argument runs headlong into Seventh Circuit precedent, which limits preemption to state laws that *directly* affect trading on a CFTC-regulated market. Coinbase cannot satisfy this standard, however, because Congress did not intend for Super Bowl bets to trade on CFTC-regulated markets. And even if it did, Coinbase can comply with both federal and state law without frustrating Congress's objectives.[4]

## A. Coinbase's contracts are not "swaps" under the Commodity Exchange Act.

Start with the definition of a "swap." Each of Coinbase's preemption arguments relies in some way on language in the Commodity Exchange Act that gives the CFTC "exclusive jurisdiction" over "transactions involving swaps" that are "traded or executed on a contract market" regulated by the commission. 7 U.S.C. § 2(a)(1)(A). If the contracts that Coinbase is offering Illinois consumers are not swaps, then none of its preemption arguments can prevail.

A swap is a type of derivative—a financial instrument where the value derives from an underlying asset. *E.g.*, *United States v. Phillips*, 155 F.4th 102, 112-13 (2d Cir. 2025). The ordinary meaning of a swap is a contract in which two parties agree to exchange future cash

---

[4] Coinbase sometimes refers to "event contracts" generally. But it has shown that Illinois is threatening to apply its gambling laws only to "a particular type of event contract—sports-related event contracts." ECF 27 at 212. Under the doctrines of Article III standing and sovereign immunity, this means that only claims concerning *sports* contracts are properly before the Court. *E.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014); *Ex parte Young*, 209 U.S. 123, 155-56 (1908). Relatedly, Coinbase does not contest that offering these contracts constitutes "sports wagering" under Illinois law. 230 ILCS 45/25-10.

flows based on an external reference. *E.g.*, *Investment Company Institute v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013). The present value of one of these assets is often uncertain—say because of fluctuating interest or currency rates. The contract allows a party to swap this uncertainty for a fixed rate of return. Consider a classic example:

> The "plain-vanilla" interest rate swap, the simplest and most common type of swap contract, obligates one counterparty to make payments equal to the interest which would accrue on an agreed hypothetical principal amount ("notional amount"), during a given period, at a specified fixed interest rate. The other counterparty must pay an amount equal to the interest which would accrue on the same notional amount, during the same period, but at a floating interest rate. If the fixed rate paid by the first counterparty exceeds the floating rate paid by the second counterparty, then the first counterparty must pay an amount equal to the difference between the two rates multiplied by the notional amount, for the specified interval. Conversely, if the floating rate paid by the second counterparty exceeds the fixed rate paid by the first counterparty, the fixed-rate payor receives payment. The agreed hypothetical or "notional" amount provides the basis for calculating payment obligations, but does not change hands.

*Thrifty Oil Co. v. Bank of America National Trust & Saving Association*, 322 F.3d 1039, 1042-43 (9th Cir. 2003). There is a clear commercial benefit to this sort of agreement. A business that is exposed to fluctuating interest rates (say on its debt) can lock in a fixed rate and thus protect itself against the risk that rates will have skyrocketed by the time the debt comes due.

Right off the bat, the ordinary meaning of a swap seems highly unlikely to encompass the sort of contracts that Coinbase is offering Illinois consumers: "'Will <team> win <title>?'" To be sure, the ultimate question is whether those contracts satisfy the statutory definition of "swap" that Congress enacted in the Commodity Exchange Act. *E.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). But the ordinary meaning of a swap still matters: "When choosing among interpretations of a statutory definition, the 'ordinary meaning' of the 'defined term' is an important contextual clue." *Delligatti v. United States*, 604 U.S. 423, 435 (2025). Plus, as explained below, Congress was concerned about financial instruments satisfying the ordinary

meaning of a swap when it enacted the statutory definition and subjected "swaps" to the CFTC's regulation. This matters too: courts interpreting a statute must not "ignore[ ] the situation that Congress faced when it enacted" the legislation because that can "lead[ ] to results that Congress is most unlikely to have wanted." *Murphy*, 584 U.S. at 469.

With this context in mind, turn now to Congress's definition. It is lengthy and written in the disjunctive. But, fortunately, Coinbase relies only on one subsection. Its contracts are "swaps" within the meaning of the Commodity Exchange Act, it says, because they provide for a "purchase, sale, payment, or delivery . . . that is dependent on [1] the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency [2] associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The argument fails for two independent reasons. *First*, Coinbase's offerings provide payments that are dependent on the *outcome* of a sporting event (say the Super Bowl)—rather than whether the event *occurs*. *Second*, athletic competitions are not inherently financial, economic, or commercial in nature.

### 1.    Coinbase's contracts do not depend on the occurrence of an "event."

As relevant here, a financial instrument is a "swap" under the Commodity Exchange Act only if it provides a payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii). Congress did not define the words "occurrence," "event," or "contingency" in this subsection. So the first task is to consult dictionaries to determine the ordinary public meaning of the words at the time the provision was enacted in 2010. *E.g.*, *Bostock v. Clayton County*, 590 U.S. 644, 654-55, 657-58 (2020).

The dictionaries reveal that "[t]he ordinary meaning of the word occurrence is something happened." *North American Derivatives Exchange, Inc. v. Nevada*, No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151, at *8 (D. Nev. Oct. 14, 2025); *see id.* at *7 & n.4 (quoting definitions).

10

This understanding "is consistent with the surrounding words of nonoccurrence and extent of the occurrence. Those words mean something happened, did not happen, or happened to an extent." *Id.* at *8. A baseball game, for example, might be played for nine innings as scheduled. It might be rained out altogether. Or it might get called in the fifth inning or stretch into fifteen innings.

As for the word "event," its "ordinary meaning" "is a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event." *North American*, 2025 WL 2916151, at *8; *see id.* at *7 & nn.5-7 (quoting definitions). True, "some dictionaries suggest 'event' could mean 'outcome.'" *Id.* at *8. But they stress that this definition is "'archaic.'" *Id.* And an archaic meaning of a word is not its ordinary meaning. *E.g.*, *United States v. Smith*, 997 F.3d 215, 223 (5th Cir. 2021); *see Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 569 (2012) ("[w]e certainly would not expect to see" the "common or ordinary" meaning of a word "designated as obsolete in" a dictionary).

It's also true that some dictionaries "identify 'event' as a synonym for 'occurrence.'" *North American*, 2025 WL 2916151, at *7. Even so, these dictionaries "make distinctions between the two" words: "'occurrence is the general word for anything that happens or takes place,' while 'an event is an occurrence of relative significance, especially one growing out of earlier happenings or conditions.'" *Id.* Because "Congress chose different words for occurrence and event in the definition of a swap," courts "must ascribe some significance to that decision." *Id.*; *see, e.g.*, *Moskal v. United States*, 498 U.S. 103, 109 (1990) (interpreting two distinct statutory terms to have identical meanings "violates the established principle that a court should give effect, if possible, to every clause and word of a statute") (cleaned up).

So "occurrence" means "something happened," and "event" means "a happening of some significance" like "a particular sporting event." *North American*, 2025 WL 2916151, at *8. What

11

about "contingency"? "[M]any dictionaries define contingency to include a contingent event": an event that might (or might not) occur. *Id.* at *8 n.9. And this is a particularly compelling reading of the Commodity Exchange Act because, in "the statutory definition of a swap, event and contingency are grouped together and so should be read in context." *Id.* (citing *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 320 (2014), and *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 8 (1985)); *see KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 3286282, at *6 (D. Nev. Nov. 24, 2025) (same).

Putting this all together in the context of the athletic competitions that are relevant here, "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" refers to *whether* a game (or race or match) will happen. 7 U.S.C. § 1a(47)(A)(ii). It does not refer to which team (or competitor) will *win* the game. "An ordinary American interpreting the word 'event' would conclude that the Kentucky Derby," for example, "is an event. But [which horse] wins the Kentucky Derby is an *outcome* of that event, not a separate event in and of itself." *North American*, 2025 WL 2916151, at *8 (emphasis added).

This spells doom for Coinbase's argument that the contracts it offers Illinois consumers are "swaps" within the meaning of the Commodity Exchange Act. Recall, those contracts ask: "'Will <team> *win* <title>?'" ECF 27-1 at 244 (emphasis added). As Coinbase's partner Kalshi concedes in CFTC filings, its contracts offer a payout "based on the *outcome* of a recurrent event" in the major American professional and collegiate sports leagues: for example, which team will *win* "'The 2025 National Football League Super Bowl' or 'The 2025 National Football League American Football Conference Championship'" (rather than *whether* those games will happen). *Id.* at 249 (emphasis added). And a financial instrument that offers a payout based on whether a team will win a game is not "dependent on the occurrence, nonoccurrence, or the

12

extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii).

Coinbase insists that this understanding of section 1a(47)(A)(ii) relies on an "illusory" distinction between an event's occurrence and its outcome. ECF 27 at 231. But Coinbase does not engage with the plain language of the Commodity Exchange Act, much less explain why the ordinary public meaning of the words that Congress enacted leads to this conclusion: "Rather than confront that statutory text, [Coinbase] asks [the Court] to ignore it altogether." *National Association of Manufacturers v. Department of Defense*, 583 U.S. 109, 127 (2018).

Besides, the distinction is not illusory. Coinbase's point is that, in some circumstances, the *occurrence* of a game is correlated with a team's *winning* a prior game. ECF 27 at 231. Take baseball's World Series: the first team to win four games wins the championship. So, if the Los Angeles Dodgers lose three of the first five games, they must *win* the sixth game for there to *be* a seventh game. But Coinbase is wrong to say that there are no "differences of substance" between asking "Will the Dodgers win Game 6?" versus "Will there be a Game 7?" The answer to the latter question must account not only for the odds of a Dodgers loss in Game 6 but also for the possibility that Game 7 will be called off for independent reasons—say because of an act of terrorism or a natural disaster. The additional risk may be small, but it is not zero: many sporting events were unexpectedly cancelled at the outset of the Covid-19 pandemic, for instance.

What's more, this sort of correlation is uncommon. It does not exist for any of the Dodgers' 162 regular season games, which will be played (or not) regardless of the teams' prior records. So too for football's Super Bowl and college basketball's March Madness. Really, the correlation that Coinbase has identified is found almost exclusively in the "best of four" playoff series used to determine the champion of some professional sports. Even there, it is present only in limited circumstances: whether Game 2 of the World Series will be played, for example, does

not depend on which team wins Game 1. All told, this flimsy argument provides no justification to depart from the plain language of the Commodity Exchange Act.

<div align="center">

**2.     Coinbase's contracts are not "associated with" an economic consequence.**

</div>

As relevant here, a financial instrument is not a "swap" under the Commodity Exchange Act simply because it provides a payment "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of" *any* "event or contingency." 7 U.S.C. § 1a(47)(A)(ii). The definition is satisfied only if the event or contingency is "associated with a potential financial, economic, or commercial consequence." *Id.* Congress did not define the word "associated," which generally means "join[ed] or connect[ed] together." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *see Hendrick*, 2025 WL 3286282, at *6 n.1 (same).

How closely must an event be joined with an economic consequence to satisfy this standard? As Coinbase sees things, not very. It contends that athletic competitions are "associated with" economic consequences because they have "significant, predictable, and measurable economic ramifications." ECF 27 at 231-32. Coinbase's minor premise isn't wrong: College football games, for example, do draw out-of-town fans who may spend money at local businesses while they're visiting for the game. *Id.* at 232. And Coinbase is correct that investors are buying stakes in teams, while media companies fight for the rights to air their games. *Id.*

But the Commodity Exchange Act's definition of a "swap" would scarcely have any limits if downstream economic impacts like these were sufficient. *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 565 (1995) ("depending on the level of generality, any activity can be looked upon as commercial"). Suppose you tell your daughter that you'll add an extra $10 to her allowance if she spends Saturday morning helping her little sister learn her multiplication tables. A weekend study session is an "event" as Coinbase reads the statute. And surely mastering basic

<div align="center">14</div>

math has a potential downstream economic consequence: it improves the chances of earning the strong high school grades that are necessary for admission to a prestigious college and thus a higher-paying job. So, if Coinbase is correct, you may have entered into a "swap" that is subject to the CFTC's regulation (and a whole host of onerous restrictions). This is not a sensible way to read a statute. *E.g.*, *Maracich v. Spears*, 570 U.S. 48, 60 (2013) ("limits" must be "placed" on the statutory "phrase 'in connection with'" because otherwise it "is essentially 'indeterminat[e]'").

A better reading starts with the text and applies the usual tools of statutory interpretation. Congress's definition of "swap" requires a connection between an action (the occurrence of an event) and an outcome (an economic consequence). 7 U.S.C. § 1a(47)(A)(ii). To say that an action is "associated with" an outcome usually describes a relationship like proximate cause. *E.g.*, *Greater New Orleans Broadcasting Association, Inc. v. United States*, 527 U.S. 173, 185 (1999) ("social costs associated with 'gambling'"). And the ordinary meaning of a swap requires an even closer connection: a swap typically provides a payout when something happens that is *itself* an economic consequence (like a change in interest rates). *E.g.*, *Phillips*, 155 F.4th at 108, 112-13 ("swaps are pure financial instruments based on the difference between two fluctuating values") (cleaned up); *Investment Company Institute v. CFTC*, 891 F. Supp. 2d 162, 171 (D.D.C. 2012) (swaps are "'financial contracts in which two counterparties agree to exchange or "swap" payments with each other as a result of such things as changes in a stock price'"); *see Delligatti*, 604 U.S. at 438 ("'Since on this side of the looking-glass an entirely artificial definition is rare, the meaning of the [statutory] definition is almost always closely related to the ordinary meaning of the word being defined.'") (quoting SCALIA & GARNER, READING LAW 228 (2012)).[5]

---

[5] *See* 7 U.S.C. § 1a(47)(A)(iv) (defining "swap" by ordinary meaning); *Bond v. United States*, 572 U.S. 844, 862 (2014) ("We are reluctant to ignore the ordinary meaning of 'chemical weapon' when doing so would transform [the] statute . . . into one that [ ] makes it a federal offense to poison goldfish.").

Applying these interpretive tools to the statutory definition of a "swap," the best reading of the phrase "associated with" requires "that the event or contingency itself has some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences." *Hendrick*, 2025 WL 3286282, at *6. In other words, Congress defined a "swap" as an agreement that provides a payout based on an event that is *inherently* financial, economic, or commercial in nature. *Id.*

The contracts that Coinbase is offering Illinois consumers are not "swaps" because neither the occurrence nor the outcome of an athletic competition is *inherently* financial, economic, or commercial in the same sense as a change in interest rates or the relative value of two currencies. *Hendrick*, 2025 WL 3286282, at *6. To be sure, sports can have downstream economic consequences: fans attending the Super Bowl next month will spend money on beer and hot dogs. But almost anything "might have some conceivable financial consequence if one is creative enough"; if this was sufficient, a swap would include any agreement that pays out based "on anything that happens or could happen," which "is not a reasonable interpretation of the statute." *Id.*; *see California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("as many a curbstone philosopher has observed, everything is related to everything else"). One can also imagine agreements related to sports that *would* provide a payout based on an inherently economic event: perhaps a change in the value of a football franchise. But these are not the contracts that Coinbase is offering. Contracts that ask "'Will <team> win <title>?'" are not "swaps" because a team's winning or losing a game is not, itself, an economic consequence.

This result follows not only from the text of the Commodity Exchange Act but also from its structure. Recall that Congress defined "swap" as an agreement that satisfies the requirements

16

listed in one of six subparts. 7 U.S.C. § 1a(47)(A). Coinbase says its contracts are swaps under subpart (ii). The other subparts, however, "refer almost exclusively to financial measures, indices, or instruments." *Hendrick*, 2025 WL 3286282, at *7; *see, e.g.*, 7 U.S.C. § 1a(47)(A)(iii) (defining a "swap" as providing for an exchange of payments "based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind"). When "several items in a list share an attribute," this "counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994). "Reading subpart (ii) in context of the surrounding subparts" thus lends further support for "the conclusion that 'associated with a potential financial, economic, or commercial consequence' means that the event or contingency must be inherently associated with a potential financial consequence, not just that the event or contingency may have some potential downstream financial consequence." *Hendrick*, 2025 WL 3286282, at *7.

Finally, on top of text and structure, consider history. After all, "ignor[ing] the situation that Congress faced when it enacted" a statute can "lead[ ] to results that Congress is most unlikely to have wanted." *Murphy*, 584 U.S. at 469; *see Edwards v. Aguillard*, 482 U.S. 578, 595 (1987) (courts interpreting a statute may consider "historical context" and "events leading to [its] passage"). Here, the definition of "swap" comes from the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, § 721. "Trading in swaps" based on inherently economic events "exploded in the early 2000s leading up to the 2008 financial crisis," and "many saw the previous lack of regulation in swaps as a contributing cause." *Phillips*, 155 F.4th at 113. Congress agreed that unregulated trading in swaps and other derivatives was "a major contributor to the financial crisis:" the lack of transparency in a market "dominated by the too-

17

big-to-fail financial companies" caused concerns about counterparty risk that "played an important role in freezing up credit markets"; the absence of "regulatory requirements for margin or capital" allowed traders to "take large speculative positions on a relatively small capital base"; and the opaque interconnectedness of these markets "'amplified or transmitted shocks'" and other risks throughout the system. Senate Report 111-176 at 29-32; *see Digital Realty*, 583 U.S. at 155 (relying on report as evidence of Congress's purpose in enacting Dodd-Frank). And Congress was particularly concerned about credit-default swaps, Senate Report 111-176 at 29-30, which provide for a payout based on the occurrence of an inherently economic event like "a reduction in [a company's] credit rating," *Hoosier Energy Rural Electric Cooperative, Inc. v. John Hancock Life Insurance Co.*, 582 F.3d 721, 724 (7th Cir. 2009).

This is why Congress gave the CFTC "exclusive jurisdiction" over "transactions involving swaps": because it wanted to address these "systemic risks in the financial sector that undermined U.S. financial stability." *Hendrick*, 2025 WL 3286282, at *7. The definition of "swap" that Congress enacted to shape the CFTC's mandate "should be interpreted through that lens." *Id.* In other words, it should reflect the financial instruments that Congress intended to regulate. And the Court can be confident that Congress was spurred to action back in 2010 by unregulated trading in financial instruments based on inherently economic events—the common meaning of a "swap"—rather than by people betting on which team will win the Super Bowl.

### B. Congress did not intend to displace the states' gambling laws when it gave the CFTC "exclusive jurisdiction" over swaps.

Even if Coinbase's contracts satisfied the statutory definition of "swaps" (they do not), it would not follow that Congress intended to preempt the application of Illinois law. Coinbase's preemption arguments rely on the Commodity Exchange Act provision that says the CFTC "shall have exclusive jurisdiction" over "transactions involving swaps" that are traded on markets it

18

regulates. 7 U.S.C. § 2(a)(1)(A). But Seventh Circuit precedent forecloses Coinbase's argument

that "Congress intended only the CFTC to regulate these transactions." ECF 27 at 233.

> 1.     **Section 2(a)(1)(A) of the Commodity Exchange Act only preempts state laws that directly affect trading on a regulated market.**

Section 2(a)(1)(A) of the Commodity Exchange Act provides:

> The [CFTC] shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions involving swaps . . . traded or executed on a contract market designated pursuant to section 7 of this title . . . . Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

Although at first blush the "exclusive jurisdiction" language of the first sentence may seem to

"coexist[ ] somewhat uneasily" with the savings clauses that immediately follow, the Seventh

Circuit has explained definitively how all this statutory language can be given "full effect."

*American Agriculture Movement, Inc. v. The Board of Trade of the City of Chicago*, 977 F.2d

1147, 1155 (7th Cir. 1992); *see Effex Capital, LLC v. National Futures Association*, 933 F.3d

882, 893 n.26 (7th Cir. 2019) (explaining that these portions of *American Agriculture* remain

good law). For starters, the Seventh Circuit rejected the argument that, in granting the CFTC

"exclusive jurisdiction" over certain financial instruments, Congress intended "to completely

preempt state law[s]" affecting those instruments. *American Agriculture*, 977 F.2d at 1155.

Rather, the court continued, "Congress intended to preempt some, but not all, state laws that bear

upon the various aspects of commodity futures trading" and other regulated products. *Id.*[6]

---

[6] To be sure, *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025), holds otherwise. But that district court case is contrary to Seventh Circuit precedent and therefore lacks persuasive value. *E.g.*, *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

To determine "how this line should be drawn," the Seventh Circuit examined "the goals and policies underlying the statute." *American Agriculture*, 977 F.2d at 1155-56; *see Murphy v. Smith*, 583 U.S. 220, 226 (2018) (endorsing courts' "stepping back to take in the larger statutory scheme surrounding the specific language" at issue). The court concluded that state laws are preempted under section 2(a)(1)(A) of the Commodity Exchange Act only if they "*directly* affect trading on or the operation of a [regulated] market" and therefore "stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *American Agriculture*, 977 F.2d at 1156-57 (emphasis added) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Applying this standard, the Seventh Circuit reasoned that state law claims were preempted because they sought to hold a CFTC-regulated market liable for ordering certain participants to liquidate their positions—an obvious attempt to undermine market integrity. *Id.*

The Seventh Circuit was correct to find that section 2(a)(1)(A)'s "exclusive jurisdiction" language must be read with its savings clauses to preserve most state law. *E.g.*, *Pulsifer v. United States*, 601 U.S. 124, 133 (2024) (statutes are interpreted "by reviewing text in context"). To see why, begin by recognizing that section 2(a)(1)(A)'s assertion about the CFTC's "exclusive jurisdiction" would be an unusually oblique way for Congress to communicate its preemptive intent. *See Kerr v. First Commodity Corp. of Boston*, 735 F.2d 281, 288 (8th Cir. 1984) ("Nothing in the [Commodity Exchange] Act deals expressly with the preemption question.").

Compare, for example, the two provisions of the Commodity Exchange Act that everyone agrees expressly preempt state law: *First*, Congress said that federal law "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" under certain circumstances that do not include swaps and that everyone agrees are not applicable here. 7 U.S.C. § 16(e)(2). *Second*, Congress said that a swap "may not be regulated as an insurance

20

contract under the law of any State" (omitting any reference to gambling regulations). *Id.*
§ 16(h)(2). In contrast to section 2(a)(1)(A), the language of these separate sections of the statute
plainly "expresses" the "clear and manifest purpose" required to conclude that Congress
"intend[ed] to supersede" the states' "historic police powers." *Patriotic Veterans, Inc. v. Indiana*,
736 F.3d 1041, 1046 (7th Cir. 2013). And the existence of these express preemption provisions
"implies that matters beyond [their] reach"—like the application of state gambling regulations to
swaps—"are not pre-empted." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992).

What's more, "exclusive jurisdiction" is most naturally read to delineate which court or
agency has power to *act* (as opposed to which *law* applies). *E.g.*, *Haaland v. Brackeen*, 599 U.S.
255, 265-66 (2023) (distinguishing between separate statutory provisions that displace state law
and grant "exclusive jurisdiction" to tribal courts); *Transcontinental Gas Pipe Line Co., LLC v.
Pennsylvania Environmental Hearing Board*, 108 F.4th 144, 151-52 (3d Cir. 2024) (giving
"exclusive jurisdiction" to federal courts withdraws state courts' concurrent jurisdiction).[7]

As it turns out, this is the very reason why Congress used the phrase "exclusive
jurisdiction" in section 2(a)(1)(A): "to make clear that as among *federal agencies*, the CFTC
would have exclusive authority" to regulate "rather than the [Securities and Exchange
Commission]." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 678 (D. Md. 2025) (citing *Merrill
Lynch*, 456 U.S. at 386); *see R.J. Hereley & Son Co. v. Stotler & Co.*, 466 F. Supp. 345, 347
(N.D. Ill. 1979) ("reference to [CFTC]'s exclusive jurisdiction was merely intended to remedy
the confusion about whether certain types of commodities transactions [were] subject to

---

[7] Perhaps this is why *Slaney v. The International Amateur Athletic Federation*, 244 F.3d 580, 596 (7th Cir.
2001), affirmed a dismissal for lack of jurisdiction when confronted with similar language. *See Turek v.
General Mills, Inc.*, 662 F.3d 423, 425 (7th Cir. 2011) (preempted claims are dismissed on the merits).

21

regulation under the securities laws").[8] The language was added to the Commodity Exchange Act during "an extensive overhaul" in 1974; Congress "expanded the statute's coverage" and also "altered its enforcement scheme" by creating the CFTC. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). The point of spelling out the CFTC's "exclusive jurisdiction" was to allocate turf between the federal commodities and securities regulators. *Id.* This undermines Coinbase's preemption theory because Congress typically "must do much more to" displace state law than simply enact "a statute granting regulatory authority over that subject matter to a federal agency." *Kurns v. Railroad Friction Products Corp.*, 565 U.S. 625, 638 (2012) (Kagan, J., concurring). If anything, the Seventh Circuit was overly generous to Coinbase's position in holding that section 2(a)(1)(A) reflects congressional intent to displace any state law at all.

One final note about *American Agriculture*: unlike Coinbase's arguments to this Court, the Seventh Circuit's analysis interweaves all preemption categories, which, of course, "'are not rigidly distinct.'" *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019). After considering the text and structure of the Commodity Exchange Act, the court concluded that, to the extent section 2(a)(1)(A)'s "exclusive jurisdiction" language operates as express preemption, Congress's intent was to adopt a form of conflict preemption: displacing only state laws that "directly affect trading on or the operation of a [regulated] market." 977 F.2d at 1156-57. Whatever the label, Coinbase must satisfy this standard to prevail on its argument that section 2(a)(1)(A)'s "exclusive jurisdiction" language displaces Illinois law regulating sports wagering.[9]

---

[8] Section 2(a)(1)(A)'s reference to "other regulatory authorities under the laws of . . . any State" is therefore best read to mean state *securities* regulators. *See, e.g.*, *Fischer v. United States*, 603 U.S. 480, 488 (2024) ("a general phrase can be given a more focused meaning by the terms linked to it").

[9] For this reason, the following section I.B.2 addresses both Coinbase's express and conflict preemption theories, which rise and fall together under the Seventh Circuit's standard. Coinbase's field preemption theory, which *American Agriculture* forecloses altogether, is addressed separately in section I.B.3.

## 2.    Illinois law does not directly affect trading on a regulated market.

Coinbase cannot show that state law directly affects trading on CFTC-regulated markets because Congress expressly intended to exclude from those markets contracts that ask: "'Will <team> win <title>?'" When Congress subjected swaps to CFTC regulation, it also authorized the commission to prohibit the very contracts that Coinbase wishes to offer Illinois consumers. Recall that, under a "special rule," the CFTC "may determine that" certain contracts (including the ones at issue here) "are contrary to the public interest" because they "involve," among other things, "gaming," "terrorism," or "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I), (II), & (V). A contract that the CFTC determines is "contrary to the public interest" may not "be listed or made available for clearing or trading on or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii). What's more, a CFTC regulation preemptively forbids any "registered entity" to "list for trading or accept for clearing" a swap "that involves, relates to, or references," among other things, "gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1); *see* 18 U.S.C. § 1084(a) (criminalizing "transmission in interstate or foreign commerce of bets or wagers" on "sporting event[s] or contest[s]").

Legislative history confirms what the text of the Commodity Exchange Act establishes: Congress did not intend for sports wagering to take place on CFTC-regulated markets. *See, e.g.*, *Sturgeon v. Frost*, 587 U.S. 28, 54 (2019) (consulting legislative history to confirm statute's plain language). The sponsor of the "special rule" explained that its purpose was to "prevent gambling through futures markets" and "protect the public interest from gaming contracts." 156 Cong. Rec. S5906 (daily ed. July 15, 2010). That's because Congress anticipated Coinbase's gambit:

> The [CFTC] needs the power to, and should, prevent derivatives contracts that are
> contrary to the public interest because they exist predominantly to enable
> gambling through supposed "event contracts." It would be quite easy to construct
> an "event contract" around sporting events such as the Super Bowl, the Kentucky

23

Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.

*Id.* at S5907. And Coinbase's partner Kalshi agrees with this reading of congressional intent. As it recently told another federal court: "the legislative history directly confirms" that "Congress did not want sports betting to be conducted on derivatives markets." Appellee's Brief at 41, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024).

Even if Congress *did* want sports betting to be conducted on derivatives markets (it did not), Coinbase still could not show that Illinois gambling regulations *directly* affect the operation of those markets. This is a high hurdle to clear: recall that in *American Agriculture*, for example, the Seventh Circuit found that the Commodity Exchange Act preempted state law claims seeking to hold a CFTC-regulated market *itself* liable for ordering certain participants to liquidate their positions. 977 F.2d at 1156-57; *see Effex Capital*, 933 F.3d at 896 (preempting state law claims concerning disciplinary proceedings for unlawful market activity). The touchstone, in short, is state regulation that materially *interferes* with CFTC-regulated markets.

Coinbase's complaint, by contrast, is not that complying with state law is *impossible*—or that it would effectively prevent it from offering contracts on CFTC-regulated markets that ask: "'Will <team> win <title>?'" To the contrary, here federal and state law may coexist in harmony: Coinbase simply must obtain a license from the Illinois Gaming Board and follow state regulations. 230 ILCS 45/25-20(a); *see Martin*, 793 F. Supp. 3d at 686 ("Maryland sports gambling laws" do "not pose an obstacle to Kalshi making" its contracts "available to users in Maryland"); Slip op. at 13-14, *Commonwealth v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct. Jan. 20, 2026) (same).[10] Overlap between federal and state law does not, on its own,

---

[10] Available at fingfx.thomsonreuters.com/gfx/legaldocs/gkvlqewxzpb/01202026kalshi.pdf.

suffice for conflict preemption: "To preserve the federal system, we do not prevent the States from regulating everything federal law touches." *Zyla Life Sciences, L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326, 335 (5th Cir. 2025); *see MITE Corp. v. Dixon*, 633 F.2d 486, 493 (7th Cir. 1980) ("mere differences between state and federal regulation of the same subject are not conclusive of preemption").[11] Anyway, Coinbase's grumblings about the unspecified chaos of having to comply with multiple states' laws "is simply too speculative a basis on which to rest a finding of pre-emption." *English v. General Electric Co.*, 496 U.S. 72, 90 (1990) (cleaned up).

Coinbase's only concrete worry concerns "geographic restrictions" under Illinois law that it thinks could be "inconsistent" with the federal requirement to "provide all users with 'impartial access to its markets and services.'" ECF 27 at 237 (quoting 17 C.F.R. § 38.151(b)). But this rule applies to Kalshi, not Coinbase, and anyway is about discriminatory access criteria and fee structures; it has no relevance here. To be sure, an Illinois gambling license would only allow Coinbase to accept wagers from people located in Illinois. 230 ILCS 45/25-25(e). An Illinois license does not *prevent* Coinbase from accepting wagers from people located in other states, however, so long as it complies with those other states' laws. Regardless, there are more than enough people in Illinois to allow a state-specific market in Kalshi's contracts to be sufficiently liquid for price discovery (and arbitrage should eventually cause prices to converge across all state-specific markets). It is even conceivable that multiple states working together with Kalshi and Coinbase could find ways to allow their residents to sell each other *legal* sports-betting contracts on CFTC-regulated markets. *E.g.*, Multi-State Internet Gaming Agreement (allowing online poker players from different states to play each other).[12]

---

[11] So it is no problem that Illinois would prevent Coinbase from offering some contracts that federal law might allow—like "wagers on a kindergarten through 12th grade sports event." 230 ILCS 45/25-25(h).

[12] Available at compacts.csg.org/wp-content/uploads/2024/03/Multistate-Internet-Gaming-Agreement.pdf.

Bottom line: none of Coinbase's quibbles establishes any serious obstacle to achieving Congress's purpose in regulating swaps under the Commodity Exchange Act. So its express and conflict preemption theories must fail. ECF 27 at 223-32, 235-38.

### 3.    Congress did not preempt all state laws affecting regulated markets.

Finally, *American Agriculture* allows the Court to make quick work of Coinbase's argument that Congress intended to occupy the entire field of trading on CFTC-regulated markets. ECF 27 at 232-35. The theory relies on section 2(a)(1)(A)'s grant of "exclusive jurisdiction" to the CFTC. But the Seventh Circuit holds that this language does *not* reflect congressional intent "to preempt the field" because it is accompanied by two savings clauses "designed to preserve in the futures trading context at least some state law causes of actions." *American Agriculture*, 977 F.2d at 1155; *see Effex Capital*, 933 F.3d at 894 (reaffirming that "the Commodity Exchange Act [does] not manifest an intent to occupy completely the entire field").[13]

This is plainly the right result. Field preemption is "rare," *Kansas v. Garcia*, 589 U.S. 191, 208 (2020), and "confined to only a few areas," *Nelson v. Great Lakes Educational Loan Services, Inc.*, 928 F.3d 639, 652 (7th Cir. 2019). It is especially unlikely here: "regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme," *WV Association*, 553 F.3d at 302; *see Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905), and Congress incorporated state law in the Commodity Exchange Act by authorizing the CFTC to restrict certain trading involving activity that violates it, 7 U.S.C. § 7a-2(c)(5)(C)(i)(I) & (ii). Because federal courts respect "the historic police powers of the States," they will not find that federal law supersedes them "unless that was the clear and manifest purpose of Congress." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963) (cleaned up). Coinbase

---

[13] Coinbase ignores these holdings and cites *Effex Capital* for the *opposite* proposition. ECF 27 at 233.

has not shown Congress's unambiguous intent to claim the entire field for itself.

Coinbase points to other provisions of the Commodity Exchange Act that, it says, establish a comprehensive regulatory scheme governing derivatives trading. But the Supreme Court has "reject[ed]" the "contention that pre-emption is to be inferred merely from the comprehensive character of the federal" statute. *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 415 (1973). And for good reason: "subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses," so it would turn field preemption on its head to infer that Congress intends to displace *all* state law every time it enacts a comprehensive statute tackling sophisticated matters. *Id.*

## C. Congress does not "hide elephants in mouseholes."

For all these reasons, the usual interpretive methods establish that Coinbase's preemption claims must fail: sports wagers aren't swaps, and state law isn't displaced even assuming they are. If more is needed, Coinbase's arguments also run afoul two "clear statement" rules that guide courts' understanding of congressional purpose: the federalism canon and the "major questions" doctrine. Both reflect the familiar proposition that Congress does not "hide elephants in mouseholes." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001).

*First*, "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Bond*, 572 U.S. at 858 (cleaned up). Thus, courts "typically presume that a federal statute does not preempt or disrupt a state's legal or regulatory regime in areas traditionally associated with state police power without stating so *clearly*." *South Branch LLC v. Commonwealth Edison Co.*, 46 F.4th 646, 651-52 (7th Cir. 2022) (emphasis added). This "clear statement" requirement ensures that Congress "'has in fact faced, and intended to bring into issue, the critical matters

involved.'" *Bond*, 572 U.S. at 858. There is no serious question that the gambling regulations Coinbase seeks to displace are exercises of the states' traditional police powers. *E.g.*, *Rosemont v. Jaffe*, 482 F.3d 926, 936-37 (7th Cir. 2007); *King*, 834 F.2d at 111.

*Second*, courts likewise require "Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Alabama Association of Realtors v. Department of Health & Human Services*, 594 U.S. 758, 764 (2021) (cleaned up). A "colorable textual basis" alone won't suffice: "Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia v. EPA*, 597 U.S. 697, 722-23 (2022). Agan, there is no serious question that Coinbase's position would give the CFTC vast regulatory authority over a sports wagering industry that, as in other applications of the "major questions" doctrine, involves "billions of dollars" and affects "millions of people." *King v. Burwell*, 576 U.S. 473, 485 (2015); *see* ECF 27 at 216, 220.[14]

These "clear statement" rules have particular force here because the Seventh Circuit takes a "cautious[ ]" approach to Commodity Exchange Act preemption. *Effex Capital*, 933 F.3d at 894. Coinbase's approach is anything but. If sports wagers can be dressed up as swaps, then they generally *must* be traded on CFTC-regulated markets like Kalshi and may be solicited *only* by futures commission merchants like Coinbase. *North American*, 2025 WL 2916151, at *9. And if Coinbase is correct that state laws are entirely displaced, then the multi-billion-dollar sports wagering industry could play out mostly under the federal government's authority. *Id.* A few words in the Commodity Exchange Act are far too slender a reed to exact this monumental shift in regulatory competence. *E.g.*, *Martin*, 793 F. Supp. 3d at 682 ("highly unlikely that Congress

---

[14] Illinois sports wagering generates around $1.1 billion a year in adjusted gross receipts and $266 million in state taxes. Illinois Gaming Board, Annual Report at 54 (2024), igb.illinois.gov/content/dam/soi/en/web/igb/documents/reports/annual-reports/igb-annual-reports/2024-igb-annual-report.pdf.

would have overridden state gambling laws without at least some indication in the text").

## II.    Coinbase has not shown the sort of harm necessary for a preliminary injunction.

The federal courts' equity jurisdiction is subject to the same constraints today as it was at the founding. *E.g.*, *Trump v. CASA, Inc.*, 606 U.S. 831, 842 (2025). And "early American law reserved injunctions for exceptional cases." *Delaware State Sportsmen's Association, Inc. v. Delaware Department of Safety & Homeland Security*, 108 F.4th 194, 199 (3d Cir. 2024). Then, as now, a preliminary injunction's purpose is "'not to take whatever steps are necessary to prevent irreparable harm'" but rather "to ensure that, at the end of the case, the court can still grant an adequate remedy." *Id.* at 200 (quoting *O Centro Espírita Beneficente União do Vegetal v. Ashcroft*, 389 F.3d 973, 1012 (10th Cir. 2004) (McConnell, J., concurring)). Preliminary injunctions should be reserved, consistent with historical practice, for circumstances where the "harm threatens to moot a case, as when one party's conduct could destroy the property under dispute, kill the other party, or drive it into bankruptcy, 'for otherwise a favorable final judgment might well be useless.'" *Id.* at 201 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975)).

Coinbase hasn't shown this sort of harm; in fact, it hasn't shown *any* irreparable harm. The harms Coinbase is "suffering" are self-inflicted: Illinois announced its position on Kalshi's sports contracts in April 2025, ECF 27-2 at 254-55, and Coinbase spent "months" preparing to offer these contracts, ECF 27 at 213, yet inexplicably Coinbase decided to file this lawsuit at the last minute and demand instant relief, *contra O Centro*, 389 F.3d at 975 ("preliminary injunctions that alter the status quo" are "disfavored"). An "emergency" of Coinbase's own making doesn't suffice for irreparable harm. *E.g.*, *Morgan v. White*, 964 F.3d 649, 651-52 (7th Cir. 2020); *Second City Music, Inc. v. Chicago*, 333 F.3d 846, 850 (7th Cir. 2003); *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541-APG-DJA, 2025 WL 3283308, at *2 (D. Nev. Nov. 25, 2025).

**III.    The public interest and balance of equities do not support preliminary relief.**

On the other side of the ledger, a state suffers "'irreparable injury'" when it "'is enjoined by a court from effectuating statutes enacted by representatives of its people.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012). And the state law that Coinbase targets is no ordinary legislation. Unregulated gambling is potentially dangerous and creates considerable risks for the people of Illinois; the state therefore has a substantial interest in protecting the public and maintaining the integrity of the gambling activities that it allows. *E.g.*, *Midwest Electronics Gaming, LLC v. Illinois Gaming Board*, --- N.E.3d ----, 2025 IL App (1st) 241076, ¶ 32; *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (harm to opposing party and public interest merge when state is defendant).

Unregulated sports wagering presents heightened concerns. Many people believe that sports wagering "is particularly addictive and especially attractive to young people with a strong interest in sports, and in the past gamblers corrupted and seriously damaged the reputation of professional and amateur sports." *Murphy*, 584 U.S. at 460. This is why the Illinois Gaming Board works tirelessly "to preserve the integrity and security of sports wagering in this State and to promote and maintain a competitive sports wagering market." 230 ILCS 45/25-45(d); *see, e.g.*, *id.* 25-100 (creating sports wagering "voluntary self-exclusion program" to protect addicted residents). These are precisely the safeguards that Coinbase wants the Court to help it evade.

Plainly, "the public has an interest in ensuring that unlicensed sports wagering does not occur on CFTC-designated exchanges." *North American*, 2025 WL 2916151, at *11. Stacked up against this, Coinbase's self-inflicted injuries fare no better than a hapless quarterback facing the legendary 1985 Chicago Bears defense. The balance of equities overwhelmingly favors the state.

**CONCLUSION**

The Court should deny Coinbase's motion for a preliminary injunction.

Dated: January 23, 2026                    Respectfully submitted,

                                           /s/ Darren Kinkead
                                           R. Douglas Rees
                                           Darren Kinkead
                                           Office of the Illinois Attorney General
                                           115 South LaSalle Street
                                           Chicago, IL 60603
                                           (773) 590-6967
                                           Darren.Kinkead@ilag.gov