## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| COINBASE FINANCIAL MARKETS, INC., | Civil Action No.: 1:25-cv-15406 |
| *Plaintiff,* | District Judge Martha M. Pacold |
| v. | |
| KWAME RAOUL, et al. | |
| *Defendants.* | January 30, 2026 |

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, ARIZONA INDIAN GAMING ASSOCIATION, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, MINNESOTA INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, WASHINGTON INDIAN GAMING ASSOCIATION, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, NATIONAL TRIBAL GAMING COMMISSIONERS AND REGULATORS, NATIVE AMERICAN FINANCE OFFICERS ASSOCIATION, TRIBAL ALLIANCE OF SOVEREIGN INDIAN NATIONS, SAN MANUEL GAMING AND HOSPITALITY AUTHORITY, AND 23 FEDERALLY RECOGNIZED INDIAN TRIBES AS AMICI CURIAE IN SUPPORT OF DEFENDANTS**

### INTRODUCTION

The Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), Arizona Indian Gaming Association ("AIGA"), California Nations Indian Gaming Association ("CNIGA"), Minnesota Indian Gaming Association ("MIGA"), Oklahoma Indian Gaming Association ("OIGA"), Washington Indian Gaming Association ("WIGA"), United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), National Tribal Gaming Commissioners and Regulators ("NTGCR"), Native American Finance Officers Association ("NAFOA"), Tribal Alliance of Sovereign Indian Nations ("TASIN"), San Manuel Gaming and Hospitality Authority ("SMGHA"), and 23 federally recognized Indian tribes ("Amici Tribes")[1]

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Cher-Ae Heights Indian Community of the Trinidad Rancheria; Elk Valley Rancheria; Enterprise Rancheria of Maidu Indians of California; Karuk Tribe; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mescalero Apache Tribe; Mohegan Tribe of Indians of Connecticut; Morongo Band of

(collectively, "Tribal Amici") respectfully submit this brief in support of Defendants' response to Coinbase Financial Markets, Inc.'s ("Coinbase") motion for preliminary injunction.

## STATEMENT OF INTEREST

As described more fully in their Motion for Leave to File Amicus Brief, IGA, NCAI, AIGA, CNIGA, MIGA, OIGA, WIGA, USET SPF, NTGCR, NAFOA, TASIN, SMGHA, and the Amici Tribes all have a shared, strong interest in this case because of its potential to have a significant impact on tribal sovereign rights regarding gaming on Indian lands. Tribal gaming revenue provides vital funding for essential government services, tribal programs, and economic development.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Coinbase comes before this Court and asks it to wholly abandon the national policy of state and tribal sports-betting regulation and to turn decades of federal law on its head. The Court should not be persuaded to do so.

America's history is replete with prospectors taking resources from Indian lands without permission from Tribes. But Congress put a stop to that practice long ago. Yet Coinbase would have this court believe that, without so much as a whisper of legislative intent, Congress gave it permission to enter Indian lands and siphon gaming revenues away from tribes over such tribes' objections. Congress did no such thing.

When Congress adopted the Indian Gaming Regulatory Act ("IGRA"), it sought to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments." 25

---

Mission Indians; Pechanga Band of Indians; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Mission Indians; San Pasqual Band of Diegueno Mission Indians of California; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Spokane Tribe of the Spokane Reservation; Sycuan Band of the Kumeyaay Nation; Table Mountain Rancheria; Tunica-Biloxi Indian Tribe; and Yuhaaviatam of San Manuel Nation.

U.S.C. § 2702(1). IGRA has been incredibly successful on that front.[2] Since IGRA's passage in 1988, tribes across the United States have lifted entire generations out of poverty through tribal gaming. Gaming revenue supports thousands of jobs in hundreds of communities, and provides critical funding to tribal, state, and local governments through revenue-sharing agreements, taxes, and economic stimulus. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 810 (2014) (Sotomayor, J., concurring) ("[T]ribal gaming operations cannot be understood as mere profit-making ventures that are wholly separate from the Tribes' core governmental functions."). For tribes, gaming is not a "commercial" endeavor but an existential one.

Tribes have primary jurisdiction over their lands and activities occurring thereon. Tribes, like states, also have a strong sovereign interest in determining what gaming activities may take place on their lands. Thus, tribal jurisdiction extends to gaming, which has long been recognized by Congress and the Supreme Court. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218–22 (1987); 25 U.S.C. § 2701(5). In 1988, Congress enacted IGRA "to provide a statutory basis for the regulation of gaming by an Indian tribe … to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to ensure that gaming is conducted fairly and honestly by both the operators and players." 25 U.S.C. § 2702(2).

Coinbase asks this court to subvert this longstanding and comprehensive regulatory regime. The consequences of Coinbase's arguments are difficult to overstate. Its reading of the Commodity Exchange Act ("CEA") would amount to a *sub silentio* reversal of congressional policy and Supreme court precedent; eviscerate existing tribal-state gaming compacts and

---

[2] *See, e.g.*, National Indian Gaming Commission, FY 2023 Gross Gaming Revenue Report 4–5 (Jul. 2024), available at https://www.nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

regulatory frameworks; allow Coinbase to siphon gaming revenues from tribal and state governments; and diminish tribal self-determination.

Accordingly, this Court should deny Coinbase's motion for a preliminary injunction.

## ARGUMENT

### I. Congress Did Not Impliedly Repeal IGRA.

#### A. IGRA's Structure

In IGRA, Congress explicitly stated that no class III gaming can occur on "Indian lands" unless it is authorized by the tribal government and is in a state that permits such gaming. 25 U.S.C. § 2710(d)(1). Class III gaming—including sports wagering—is authorized on Indian lands only where tribes and states have entered into a compact or procedures prescribed by the Secretary of the Interior to regulate that gaming. 25 U.S.C. §§ 2710(d)(1), 2710(d)(7)(B)(vii); *see also* 25 C.F.R. § 502.4(c). The Secretary of the Interior must review and approve these agreements in order for them to take effect, and for lawful class III gaming to occur on tribal lands. 25 U.S.C. § 2710(d)(8). These core provisions have remained unchanged since 1988.

Under this regime, regulation of class III gaming on Indian lands is shared between three sovereigns: tribes, states, and the federal government. Federal courts have described IGRA's regulatory regime as so comprehensive that it preempts state laws regulating gaming on Indian lands. *See Cayuga Nation v. Tanner*, 6 F.4th 361, 377 (2d Cir. 2021); *see also Wells Fargo Bank N.A. v. Sakagon Chippew Cmty.*, 787 F.Supp. 2d 867, 875 (E.D. Wis. 2011).

Congress carefully crafted this comprehensive statutory regime to advance clearly articulated policy goals to: (1) "promot[e] tribal economic development, self-sufficiency, and strong tribal governments"; (2) provide a statutory basis for regulation that protects players and tribes' ability to be the primary beneficiary of gaming on their lands; and (3) create a federal regulatory agency to adopt federal standards and protect tribal gaming as a means of generating

4

tribal revenue. 25 U.S.C. § 2702. Congress made it abundantly clear that tribes—not private

entities—must benefit from any gaming conducted on their Indian lands. *See* 25 U.S.C.

§ 2710(b)(2)(A), (d)(2)(A). For many tribal governments, gaming is not merely a "commercial"

endeavor; rather, it is essential to their self-determination. *See Chicken Ranch Rancheria of Me-*

*Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022) ("Class III gaming is not only a

source of substantial revenue for tribes, but *the lifeblood on which many tribes ha[ve] come to*

*rely*." (citation modified)).

### B. Congress Did Not Repeal IGRA or Prohibit Tribes from Conducting Sports Betting When It Enacted the CEA's Definition of a "Swap" in 2010.

Coinbase does not assert that its conduct complies with IGRA. In fact, Coinbase has

made no attempt to ensure that its sports-betting activities on Indian lands across the country

comply with IGRA. Instead, Coinbase argues that Congress's definition of a single term—

"swaps"—within a statute whose entire purpose is to address the risk, discovery, and

dissemination of commodity prices, 7 U.S.C. § 5(a)–(b), effectively repealed core provisions of

IGRA. Under this theory, Congress silently stripped away tribes' and states' longstanding

authority over sports betting (and potentially other kinds of class III gaming) while allowing for-

profit companies like Coinbase to run internet casinos pursuant to their own private oversight.

Coinbase's argument thus does double violence. On one hand, by permitting Coinbase to

offer sports betting on tribal land, its argument sweeps aside Congress's recognition that "Indian

tribes have the exclusive right to regulate gaming activity on Indian lands." 25 U.S.C. § 2701(5).

On the other, it prohibits tribes from offering sports betting that IGRA plainly authorizes. *See* 25

C.F.R. § 502.4(c).

Moreover, if Coinbase's position is adopted, the reach of this definition could extend

beyond sports betting to encompass other forms of gaming because Coinbase's preemption

argument depends on embracing an interpretation of "swap" that has "no limiting principle." *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-575, 2025 WL 3286282, at \*6 (D. Nev. Nov. 24, 2025), *appeal filed*, No. 25-7516 (9th Cir. Nov. 28, 2025). Coinbase's definition of "an event or contingency associated with a potential financial, economic, or commercial consequence" is so broad that it necessarily includes betting on other casino and class III games. 7 U.S.C. § 1a(47)(A)(ii). The irony of this result is that the gaming conducted pursuant to tribal-state IGRA compacts or state law provides significantly more consumer protection than the unregulated sports betting offered by Coinbase, which allows users to engage in practically limitless betting.

Further, if the CEA governs Coinbase's sports-betting contracts (and potentially other forms of gaming) on Indian lands, then Congress must have intended to repeal other provisions of IGRA that expressly grant regulatory authority to tribes, states, the National Indian Gaming Commission ("NIGC"), the Department of the Interior, and the Department of Justice. *See* 25 U.S.C. §§ 2701(5), 2710(d); 18 U.S.C. § 1166(d). Congress also must have intended to completely override the entire purpose and function of IGRA, which is to recognize tribal sovereignty to conduct and regulate gaming activity that occurs on Indian lands. *See* 25 U.S.C. § 2701(5). No amount of judicial gymnastics can turn the insertion of the term "swap" in the CEA into such a radical transformation of IGRA.

This Court should thus reject Coinbase's boundless interpretation of a "swap" and give effect to both statutes by excluding sports-betting contracts from the CEA's definition of "swap." Such an interpretation is more faithful to the CEA's statutory language and legislative intent. *See* 156 Cong. Rec. S5907 (daily ed. Jul. 15, 2010) (statement of Sen. Lincoln) ("It would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the

Kentucky Derby, and Masters Golf Tournament.  These types of contracts would not serve any real commercial purpose.  Rather, they would be used solely for gambling.").

### C.  Coinbase's Theory Does Not Meet the Standard for Implied Repeals.

Coinbase's preemption argument must be rejected because it would manufacture an implied repeal of IGRA where none exists.  Coinbase cannot meet the heavy burden of proving Congress intended to repeal IGRA because there is a reasonable interpretation that gives full effect to both statutes: the CEA's definition of "swap"—and thus the CFTC's jurisdiction over such transactions—simply does not extend to Coinbase's sports bets.

This Court and others apply the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute."  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation modified); *United States v. Ill. Pollution Control Bd.*, 17 F.Supp.2d 800, 803 (N.D. Ill. 1998); *Cook Cnty. v. MidCon Corp.*, 773 F.2d 892, 905 (7th Cir. 1985).  Congress's intent to repeal must be "clear and manifest." *Epic Sys.*, 584 U.S. at 510 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Id.* at 515 (citation modified).

Here, IGRA and the CEA can easily be harmonized by reading the CEA to exclude sports betting, consistent with longstanding CFTC regulations.

### 1.  Coinbase's sports-betting contracts are not "swaps."

As relevant here, the CEA defines "swaps" as "any agreement, contract, or transaction … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or

commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Coinbase's sports-betting contracts simply do not fall under this definition and Congress therefore could not have intended to repeal IGRA. First, Coinbase's sports-event contracts are not dependent on the *occurrence, nonoccurrence, or extent of the occurrence* of a sports event—i.e., whether the sports event occurs—but rather on the outcome of the sports event (or parts thereof)—i.e., which team wins or who scores a touchdown. The Nevada District Court recently held that sports bets are not swaps for precisely this reason. *See, e.g.*, *Hendrick*, 2025 WL 3286282, at *3.

Second, there is no "financial, commercial, or economic consequence" associated with Coinbase's sports-betting contracts. Aside from whether the purchaser of a sports-betting contracts wins or loses their bet, Coinbase's sports-betting contracts have no direct financial consequences for the purchaser. To constitute a swap, the underlying event itself "must be inherently associated with a potential financial consequence." *Id.* at *7. "[E]xternalities like whether people bet on the event or the contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient." *Id.* Sports-betting contracts do not satisfy this requirement and therefore do not qualify as swaps.

2. *Congress did not manifest clear intent to repeal IGRA or to make the CFTC the nation's sole gaming regulator.*

Congress did not repeal IGRA and grant the CFTC the exclusive authority to regulate nationwide sports betting. In fact, Congress expressed the opposite intent and went out of its way to prevent event-contract markets from being used to conduct gambling. *See* 156 Cong. Rec. S5906-07 (daily ed. Jul. 15, 2010) (colloquy between Sens. Feinstein and Lincoln). To that end, Congress enacted the "Special rule" authorizing the CFTC to "determine that such agreements, contracts, or transactions are contrary to the public interest" and to *disallow* any "gaming" activity on DCMs at all. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii). The CFTC acted

8

consistently with Congress's intent by promulgating its blanket prohibition of event contracts involving gaming. 17 C.F.R. § 40.11(a)(1). As the CFTC explained, its "prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" Provisions Common to Registered Entities, 76 Fed. Reg.44776, 44786 (Jul. 27, 2011) (quoting 156 Cong. Rec. S5906-07 (daily ed. Jul. 15, 2010) (colloquy between Sens. Feinstein and Lincoln)). Thus, the CFTC recognized that the Special Rule reinforced Congress's existing policy *against* sports betting. Taken together, the Special Rule and the CFTC's regulations undermine any claim that Congress intended to repeal IGRA and legalize sports betting.[3]

Furthermore, only Coinbase (a private company with a direct interest in offering its lucrative sports-betting contracts)—not Congress or the CFTC—claims the CEA's definition of "swap" displaces tribal, state, and federal regulation of sports betting. The 2010 CEA amendments' text and legislative history, and subsequent CFTC actions, confirm Congress did not establish the CFTC to regulate sports betting, let alone assume the role of the nation's sole sports-betting regulator. Coinbase's attempt to foist authority onto the CFTC (which the CFTC does not claim for itself) indicates that Coinbase is wrong about the meaning of "swap." *See* Event Contracts, 89 Fed. Reg. 48968, 48982–83 (June 10, 2024) ("The [CFTC] is not a gaming regulator … and [it] does not believe that it has the statutory mandate nor specialized experience

---

[3] Under Coinbase's theory, simply calling a sports wager a "swap"—regardless of whether it is actually a valid "swap"—and listing it for trade on a DCM automatically grants the CFTC exclusive jurisdiction to the detriment of all other regulatory authorities. *See* Pl. Br. Supp. Prelim. Inj. at 12–15, Dkt. No. 27. What, then, would prevent Coinbase from calling "contracts" on other traditional forms of gaming, like roulette, "swaps" and subjecting them to the exclusive jurisdiction of the CFTC? According to Coinbase, CFTC inaction—despite banning "gaming" contracts via 17 C.F.R. § 40.11(a)(1)—is all that is required to bless contracts blatantly designed for no other purpose than to enable gambling. *Id.* at 18–19.

appropriate to oversee [gambling], or that Congress intended for [it] to exercise its jurisdiction or expend its resources in this manner.").

The CFTC's own actions confirm that it has not asserted authority to regulate sports betting. In a recent advisory letter, the CFTC clarified it has not "taken any official action to approve the listing for trading of sports-related event contracts on any DCM." CTFC Staff Letter No. 25-36 at 2 n.4 (Sep. 30, 2025). In this advisory letter, the CFTC noted that this issue is subject to ongoing litigation nationwide, and advised DCMs to ensure customers "understand the possible effects should State regulatory actions … result in termination of sports-related event contract[s]." *Id.* at 2 & n.3. Coinbase's arguments thus stand in sharp contrast to the CFTC's own unwillingness to regulate sports betting.

3. *The Indian Canons of Construction require this Court to resolve any ambiguity in favor of tribes.*

Even if there were ambiguity as to whether Congress intended to repeal IGRA when it amended the CEA in 2010 (there is not), the Indian Canons of Construction require courts to resolve statutory ambiguities in favor of tribes. *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392 (1976); *Wisconsin v. Ho-Chunk Nation*, 784 F.3d 1076, 1081 (7th Cir. 2015). Federal courts have consistently applied these canons to ensure that later-enacted statutes of general applicability cannot repeal earlier-enacted legislation specifically designed to advance the United States' special relationship with tribes, without a clear statement from Congress. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550 (1974); *Shoshone-Bannock Tribes of Fort Hall Rsrv. v. DOI*, 153 F.4th 748, 765 (9th Cir. 2025).

This Court should therefore reject Coinbase's preemption argument requiring an implied repeal of IGRA.

## II.     The Major Questions Doctrine Forecloses Coinbase's Theory.

In 2010, federal law—namely, the Professional and Amateur Sports Protection Act ("PASPA")—largely prohibited sports betting nationwide.  Coinbase's position thus requires interpreting the CEA not only to eradicate state and federal gaming laws by preemption or implied repeal, but also to reverse the federal policy that at the time prohibited sports betting— turning it instead into a nationwide authorization of such betting under the sole jurisdiction of the CFTC.[4]  Whether Congress did so is a major question.[5]

Under the Major Questions Doctrine, courts have "reason to hesitate before concluding that Congress meant to confer" agency authority in cases where the agency has asserted a "breadth" of authority over matters of "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation modified).  In such cases, considering "both separation of powers principles and a practical understanding of legislative intent," there must be "clear congressional authorization." *Id.* at 723 (citation modified).  Further, "Congress [does not] typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *Id.* (quoting *MCI Telecommunications Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218, 229 (1994)).

---

[4] Coinbase's sports-betting contracts also violate other federal laws, including the Wire Act, 18 U.S.C. § 1084, the Illegal Gambling Business Act, 18 U.S.C. § 1955, and the Travel Act, 18 U.S.C. § 1952(a).  If Congress authorized sports betting via the CEA in 2010, then it also effectively limited the scope of these federal laws, in addition to PASPA.

[5] In addition to the Major Questions Doctrine, this Court could further find that the Doctrine of Constitutional Avoidance forecloses Coinbase's arguments. Specifically, Coinbase's reliance on Kalshi's self-certifications of its sports-betting contracts violates the private nondelegation doctrine because it is based upon an understanding of the CEA that empowers Kalshi—a private, for-profit entity—to oversee an entire sports betting enterprise while simultaneously failing to provide any meaningful mechanism for advance public comment, mandatory agency oversight, or standards by which the CFTC can implement its discretion. *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 693, 697 (2025).

In effect, Coinbase contends that the 2010 CEA amendments displaced state and tribal gaming regulations, nullified all tribal-state gaming compacts, legalized sports betting nationwide, and placed sports betting under the exclusive regulatory jurisdiction of the CFTC, all at a time when federal law broadly prohibited sports betting. This is unquestionably a "radical" and "fundamental" overhaul to both PASPA and IGRA, and certainly raises concerns of "economic and political significance." This Court therefore has significant "reason to hesitate" and should require "clear congressional authorization" before even considering Coinbase's preemption argument. *Id.* at 721, 724.

First, Congress must be clear when it "alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). Here, gaming regulation, and even sports-betting regulation specifically, has been understood to be within traditional state power. *See Murphy v. NCAA*, 584 U.S. 453, 474, 481–85 (2018) (holding that PASPA prohibited states from authorizing sports betting and therefore violated the anticommandeering rule, which specifically protects state sovereignty for matters over which states traditionally regulate, such as gaming and sports betting, against unlawful acts from Congress demanding states act in particular ways). As the Supreme Court noted in *Murphy*, Congress has long structured federal criminal law to "respect the policy choices of the people of each State on the controversial issue of gambling." *Id.* at 484; *see, e.g.*, 18 U.S.C. §§ 1084, 1166, 1952, 1953, 1955 (incorporating state gambling prohibitions); *Chicken Ranch*, 42 F.4th at 1031 (explaining that IGRA "strike[s] a delicate balance" between tribal and state sovereignty over gaming (quoting *Pauma Band of Luiseno Mission Indians v. California*, 813 F.3d 1155, 1160 (9th Cir. 2015))). And even when Congress

chose to prohibit sports betting nationally through PASPA, it did so *through* state regulation, rather than by directly regulating private actors. *See Murphy*, 584 U.S. at 474.

Similarly, courts have long recognized tribes' inherent sovereign authority to regulate gaming on their lands. *See Cabazon*, 480 U.S. at 207–14. Though IGRA imposes limited restrictions on this authority, IGRA still broadly advances tribes' "exclusive right to regulate [and offer] gaming activity" (including sports betting) on their Indian lands as a means of promoting tribal economic development and self-determination. *See* 25 U.S.C. §§ 2701(5), 2702(2); *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1062–63 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671 (2024). And later-enacted statutes of general applicability—like the CEA—cannot repeal earlier-enacted legislation that is specifically designed to advance the United States' special relationship with tribes—such as IGRA—without a clear statement from Congress. *See, e.g.*, *Mancari*, 417 U.S. at 550.

Accordingly, because regulating gaming (including sports betting) has long been a traditional state and tribal power, Coinbase must show clear congressional language overturning federal policy. But it cannot because no such language exists. Rather, the CEA actually *reinforces* the federal policy in favor of state gambling regulation by disclaiming preemption of state gaming laws. *See* 7 U.S.C. § 16(e). And nothing in the definition of "swap" indicates that Congress meant to overturn the entire field of sports-betting regulation or Indian gaming.

Second, sports betting has a "unique place in American history and society," and therefore its own "political history." *See FDA v. Brown & Williamson*, 529 U.S. 120, 159–60 (2000), *superseded by statute* 21 U.S.C. § 387 *et seq*. Given this social and political history, at the time of the 2010 CEA amendments, Congress had already "for better or for worse, … created a distinct regulatory scheme" for sports betting—namely, PASPA. *Id.* The conflict between

Coinbase's argument that the CEA's 2010 amendments authorized sports betting nationwide and the existence of PASPA's nationwide sports-betting prohibition in 2010 therefore indicates that Congress could not have intended to regulate sports betting in the way that Coinbase now claims. "Given this history and the breadth of the authority that [Coinbase] has asserted [the CFTC has]," this Court should not defer to Coinbase's "expansive construction" of the CEA. *Id.* at 160.

The Supreme Court eliminated PASPA as a barrier to sports betting in 2018 when it held PASPA unconstitutional. *See Murphy*, 584 U.S. at 486. Since then, several states, including Illinois, have established regulatory schemes for sports betting under their traditional police powers. *See* 11 Ill. Adm. Code §§ 1900.110–1900.1740. But that has no bearing on whether Congress's CEA amendments in 2010 had the effect of obliterating PASPA (and IGRA), and the state laws on which it relied. Coinbase's position that Congress legalized sports betting in 2010 would have certainly come as a surprise to the Supreme Court and litigants in *Murphy*—none of whom seemed to think that the state prohibition at issue had actually been preempted years earlier.

In holding PASPA unconstitutional, the Supreme Court made no suggestion that Congress had already preempted all state gaming laws eight years earlier. *Murphy*, 584 U.S. at 479–80. To the contrary, the majority opinion concluded with an observation utterly incompatible with Coinbase's contention: "The legalization of sports gambling requires an important policy choice, but the choice is not ours to make. Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* at 486. In other words, Coinbase's deregulatory elephant was hidden in a statutory mousehole far too small for the Supreme Court to notice when deciding whether sports betting would be legal.

14

Ignoring history, context, and common sense, Coinbase presents an alternate reality in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* 7 U.S.C. § 5(a)–(b), exclusively governs nationwide sports betting, including that occurring on Indian lands.  Coinbase therefore creates a world where Congress repealed the comprehensive regulatory scheme set forth in IGRA, similar state law structures, and the then-federal policy requiring states to prohibit sports betting, as codified in PASPA.  And Coinbase incredibly argues all of this happened without even a whisper of legislative intent.[6]

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court deny Coinbase's motion for preliminary injunction.

---

[6] As the Nevada District Court aptly stated, "[i]t is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010."  *Hendrick*, 2025 WL 3286282, at *9 (footnote omitted).

Dated: January 30, 2026

/s/ Joseph H. Webster
Joseph H. Webster (*pro hac vice* pending)
Elizabeth A. Bower (*pro hac vice* pending)
Jens W. Camp (*pro hac vice* pending)
Alexandra K. Holden (*pro hac vice* pending)
Hobbs, Straus, Dean & Walker LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
(202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com

*Counsel for Tribal Amici*

Bryan Newland (*pro hac vice* forthcoming)
Powers, Pyles, Sutter & Verville PC
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
(202) 349-4265
Bryan.Newland@powerslaw.com

*Counsel for Mohegan Tribe of Indians of
Connecticut, Rincon Band of Luiseño
Indians, and Santa Ynez Band of Chumash
Mission Indians*

Respectfully submitted,

Michael Hoenig (*pro hac vice* pending)
Yuhaaviatam of San Manuel Nation
422 1st Street SE
Washington, DC 20003
(909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San Manuel
Nation and San Manuel Gaming and
Hospitality Authority*

Scott Crowell (*pro hac vice* pending)
Crowell Law Office
Tribal Advocacy Group PLLC
1487 W State Rte 89A, Suite 8
Sedona, AZ 86336
(425) 802-5369
scottcrowell@clotag.net

*Counsel for Rincon Band of Luiseño
Indians, Santa Ynez Band of Chumash
Mission Indians, and Spokane Tribe of the
Spokane Reservation*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Joseph H. Webster
Joseph H. Webster